U.S. DISTRICT COURT
DISTRICT OF VERMONT
FILED

# UNITED STATES DISTRICT COURT

2018 NOV 19  PM 2: 32

## FOR THE

BY_____ CLERK

DEPUTY CLERK

## DISTRICT OF VERMONT

*Plaintiffs*

Bruce R. Marshall

Jeanine Weir

V.

Case No. 5 : 18 - cv - 196

*Defendants*

Larry S. Bassett

Karen J. Bassett

# **COMPLAINT**

## Parties

1. Bruce R. Marshall and Jeanine Weir

P.O. Box 45

Rochester, Vermont

05767

2. Larry and Karen Bassett

10282 Sheep Road

Pittsburg, Texas

75686

# Jurisdiction

Our case falls within this jurisdiction as the defendants now live in another state; they were previously residents of Vermont (until May of last year) and now reside in Texas. & the amount involved exceeds $75,000.

# CLAIMS

## Summary

We the plaintiffs, Bruce Marshall and Jeanine Weir, having pursued other civil avenues and negotiative communication towards the recovery of money that Larry S. and Karen J. Bassett admit that they owe us, $211,198 (originally $238,198 from an initial $198,000 in Principle), in a case involving the admitted fraudulent "loss" of these total funds and the admitted overt theft of $27,000, in a fraud and theft of even greater proportions, seek the help of this Federal Court towards the protection of our rights and the recovery of our money. After being invested with what was promised to us as a low risk, conservative approach and having only received positive verbal and written monthly reports of earnings, with 1099's, Larry told us all of our (and everyone's) investment funds were "lost". He did many times apologize for his actions which he told us he knew were wrong, including having taken the last $27,000 I gave him after all the investment money was already gone, and expressed his desire to become honest and did commit to repayment of all investors. Yet despite both Larry and Karen signing a notarized contract agreeing to give us full financial disclosure (in order to release liens we put on their Vermont house days before the

house closing) Larry has **still** not been willing to show us trading records or any other documentation that would even give us proof that the said funds were indeed "lost". We also have been given no proof that all the other investors, particularly the "family" investors who we were told were owed so much, are true investors **currently** owed what Larry claimed, and thus have no idea what "fair payment" to us would actually have constituted even if Larry and Karen were as destitute as originally claimed, which we now know is not so. Bank records they subsequently did send to us showed large sums of money going in and out of Larry and Karen's joint account, with many significantly sized wire transfers, including during the time they told us they had become destitute (and had no means to pay us back anything), and other undisclosed assets have been found as well. Yet we have been paid nothing since (or besides what we received at) the sale of their house in Vermont. Contractual stipulations relevant to our repayment, have not been forthcoming. The fraud has been the original "loss" of our invested money and all that has followed that, particularly the lack of honoring the contract the Bassetts signed on May 15, 2017 to release the leins on their Cornwall house. These leins had been put on a week previously due to realizing that the lies and deceit that had become even more apparent, made it questionable that we would actually be paid from the house sale or ever. In recognizing legal demarcations such as the statue of limitations that could limit our rights and thus serve the fraud of the defendants, we thus have the honor to exercise and defend our rights, and have been forced by circumstances to come before this court as Pro Se litigants, as a fundamental right and tradition we honor.

We hereby seek a Summary Judgment from the Court and will proceed to a full trial if need be, and seek to have provided the full discovery of the Bassett's financial records and other relevant information, to uncover potential accomplices, and learn the truth, for we would rather endure the

rigors of the standards of the Court and such proceedings than to allow the Statute of Limitations to run out and thus allow the Bassetts continued fraud to abet their theft, and thus further traumatize us. We also do this because there have been others negatively effected by the Bassett's behavior and we feel that it is our duty to the public that frauds be identified.

1. A friend (Sallie Mack of Vermont) told us in fall 2014 that she had money invested with her friend Larry Bassett for over 15 years with very good returns (13-15%) on his day trading in tech stocks. She said she was given monthly reports and IRS 1099 INT's for Income Tax filing purposes. She said he had a very conservative approach to trading that was low risk due to short exposure time with limits to prevent losses, that this had been working well for years, and that he had been a CPA at Middlebury college. She said she had delivered babies in his family as midwife, that Larry was a good christian man who raised animals on a small family farm on the side. Before ever giving him money, Larry confirmed all that Sallie said, including that he had a pool of money with a few people in Vermont and a few relatives in Texas, which he invested with conservative safeguards utilized in his trading practice on tech stocks. Said that he did well through market corrections and that the accounts thrived on lots of fluctuations in the market. Larry said that he did not take a commission, but the pool helped his percentages and thus everyone's. Money deposited would be under contract, with full return of funds within ten days from request, at any point. Larry said that he was a retired CPA/comptroller for Middlebury College, with which he still used a middlebury.edu e-mail address. Once invested I pushed to keep in regular touch with him and Larry always gave us rosey reports about how things were going, saying he thrived in a difficult market, was doing well, etc. On October 2, 2104 I gave a $10,000 check to Mr. Bassett for investment.{See **Exhibit A**, signed contracts (1), IRS 1099's (2), earning reports (3), cashed checks (4), Spreadsheets (5), emails herein listed (6), and two Promissory notes from Larry (7) } Then received

a 2014 IRS 1099 INT issued by M. Bassett to Mr. Marshall for $262 dollars in Interest Earnings {see **Exhibit A**(2)}. It was only because of the report of earnings and the IRS 1099's given that I continued to invest further. Then on January 15, 2015 I gave a $100,000 check to Mr. Bassett for invesment. On August 6, 2015 a $40,000 check was given to Mr. Bassett. On October 28, 2015 a $20,0000 check was given to Mr. Bassett. Then in 2015 an IRS 1099 INT was issued by Mr. Bassett to Mr. Marshall for $18, 754 dollars in Interest Earnings {see Exhibit A (2)}. Then in September 6, 2016 a $27,000 check was given to Mr. Bassett. In October 2016 Bassett issues check for $800 per monthly withdraw request. In November 2016 $800 check was issued by Bassett, check was cashed. In December 2016 $800 check from Basset, check was cashed. Then in late January I contacted Larry one day to request an increase in my monthly draw on earnings and ask why January's check had not arrived and was informed by Karen that Larry had not returned my phone call as he was in Texas. Feeling uncomfortable with the situation and wanting to test Larry to ensure our safety, and as I was also feeling that I had invested too much with him, I emailed him a request asking for $5,000 from my account. I called him again and he did not respond until on or some time after February 7, after I sent him an email again asking when a check was coming. Then Larry called and informed me that all the investment money--everyone's-- was gone. {See **Exhibit A** (5)}

(2) Larry said he had started losing and (instead of informing investors and without their knowledge) he started throwing more and more money in to try and reverse his downward trend, opposite of his strategy of careful, conservative investing, he "gambled" to use his own words, but he kept losing until it was all gone. In the accounting Statement/Spreadsheet from Bassett for 2016 there is no trading shown in December 2016 {See **Exhibit A** (5) and (3).} The end of year totals were $238,198 which included the subtraction of 4 monthly withdrawals of $800 each. On a total of

$197,000 invested with Mr. Bassett, by the calculations he provided, the total interest earned was $41,958 of which $19,018 was accounted for by Mr. Bassett through the 2014 & 2015 IRS 1099-INT.

(3) No IRS 1099 INT for 2016 has been issued by Larry.

(4) His contractual agreement was to return my principle and earnings to me within 10 days upon request, and this he did not do, has not done. (See contract and email, **Exhibit A** (1) and (5).)

(5) The fact that suddenly everyone's money is all gone does not make sense and brings up many questions, as this does not happen overnight. He never told us he was losing or struggling, etc, he always said he was doing well, things are good with trading, **which was consistent with his written earning reports, including at the time of my placement of $27,000 on September 6, 2016**, which in May 2017 he told me he had taken from me after everything had already collapsed. (see **Exhibit A**, (3).) Larry said he had a very conservative, careful approach to investing which is not reflected in what he told us he did. (See **Exhibit B** (1), Larry's communication to fellow investor Dona Berney, who was likewise told of Larry's careful, low risk approach, both before she ever invested and afterwards.) When and since he informed us of this, he did admit that he'd "done wrong" and was "very sorry" and said that he wanted to "pay everyone back, get honest, get right with God and work and start businesses to repay everyone", as well as saying he could make good money as a CPA in Texas, and we appreciated that he seemed to have genuine remorse and wanted

to honor his commitment to people. He seemed grieved over those harmed, humbled and self reflecting to whatever degree and wanted to make a new start and be accountable to us all. Larry told us he knew he could end up in jail but wanted a chance. Karen also seemed grieved over what had happened to everyone. & we knew we were missing much information, yes. Larry and Karen both told us that they were now destitute and in great debt, their only asset being their house in Cornwall and their only income now was small social security checks, and also that they had no way of getting a loan to pay people back, **no other recourse**. On February 23 I wrote to Sallie Mack "I did speak with Larry and basically he confirmed that he was not being straight with me when I last gave him money last fall. He admitted that which also thus reveals that he was cooking the books....So basically he was losing money but stating gains. Now since we do not have the records we can not tell what is what...I would like to know who took money out and when. I would also like to know when things were real or not. The relevance concerns a number of parameters. He did not just lose the money in one swoop, he was losing big bucks for a long time...I would like some transparency as regards the trading records because that tells me if anyone might have been paid out from money I was putting in." {See **Exhibit B** (2),letter to Sallie 2/23/2017}

(6) After Larry first admitted the money was lost, I asked him if his children all knew about this, and he told me they did, "They know, they all know." (Their youngest is in his early twenties.)

(7) Requests to talk to other investors involved was denied by Mr. Bassett as well as Sallie Mack. They both said that no one else involved wanted to talk to us. (Later, Sallie refused forwarding emails written by us to another investor who was extremely upset, now known to us as Dona Berney.) We had told Larry and Sallie both that we felt particularly vulnerable as none of us in Vermont besides Sallie had known Larry long term and now they would be moving far away to

Texas with family, and we were concerned we might never hear from Larry again and thus wanted to talk to those in the family who had invested. We were then later told in no uncertain terms that none of the family wanted to talk to us. So we became even more concerned that Larry was going to Texas with family who would not even communicate in the most basic, small way, just to send a post card or have Larry forward an anonymous email, just to say something like--- we're all hurting from this unfortunate situation and are on the same page of supporting Larry to move in a better, honest direction. The family may have had fine reasons to not want to communicate with us, I am simply saying how it's felt to us, that we lost even more trust, as this felt like a callous disregard. It all together has been quite a traumatic stress and a ton of work, energy and lost time since early 2017 when Larry first broke the news, particularly difficult as both Jeanine and I have been dealing with illness, Jeanine's very serious, and we have had to deal with this and mobilize ourselves amidst the challenges of our situation (although we've held trust that grace is bringing healing and we will get out of this, and we have experienced that grace through and amidst this all, in spite of it all.)

(8) Karen also told both Jeanine and I right from the start that she was going to work also to pay back all the investors (and both Larry and Karen had said Karen had known nothing about what happened with Larry), which we appreciated, and we know Sallie Mack also really appreciated this commitment of Karen's. They together presented a strong commitment to paying everyone back. We tried to give Larry a chance, and we did give them a lot of time to make good on their stated positive intentions. We made it clear to Larry and Karen that we had to have this money, that it was not just a vacation fund and Jeanine has been very seriously ill, that I've been taking care of her and we cannot afford to wait years for repayment. Yet we've gotten conflicting reports from him, mixed

messages, lack of follow through, empty promises, changing stories and dishonesties, etc. Larry has not kept his word on what is most critical.

(9) On 2/18/17, Larry said he was applying for jobs in Texas, was working on two businesses and working on percentages people would be paid back everything, which was understandable to us when you are dealing with numerous people hurt in a situation like this, that it takes time to sort out. {See email in which he wrote this, **Exhibit C (1)**.}

(10) Since despite a few promises we had still not received a Promissory note from Larry, I sent Larry an email on 3/23/17 and he again promised it. On 3/25/17 he did email us a Promissory note (for $238,198.)(See **Exhibit C** for emails and both Promissory notes, one signed.) In the rushed situation of putting leins on their Cornwall house days before the closing date, we did not ideally word or include all we should have in the document we wrote up, yet that signed contract is based on what is owed us that is seen in our investing contracts ($ 197,000 original principle invested), the earning reports and 1099 INT's given us by Larry, and these two promissory notes from 3/25/17, which simply state the total owed us (which is now down to $ 211,198 due to what we received at the house sale.)

(11) In that same email on 3/25/17, Larry also said that at the end of April he would disperse money from his tax work and any other work to that point, which we never received. (See **Exhibit C**, emailed Promissory,3/25/17)

(12) In March 2017 we had to do some looking into things online to find out that their Cornwall house had been sold (was under contract), which was confirmed as so by Sallie Mack. Larry himself did not inform us, although eventually at some point maybe he would have. This has been the general pattern with Larry, th t we could not count on him to follow through on many things and have had to be proactive or sink.

(13) When Larry first told us what happened he said they had $330,000 paid off on their house in Cornwall and we would get 20% (since we had invested 20% of the total investment pool) as they were going to sell it to pay investors. Then much later, in March 2017, the percentage he was going to give us dropped to 13%. The reason his gave for this in an email {see **Exhibit C**, (6) was because the 20% was based upon "the three largest investors" saying they would take a cut on what he owed them, and "one of them ended up not doing so, and the other two did by very significant amounts but not as much as they first indicated." This does not make sense as what is shown on Larry's own spreadsheet that we received right before the house closing on 5/12/17 (that showed what Larry decided to pay all investors from the house sale proceeds, **Exhibit A**, (5) Closing Figures/repayment Spreadsheet) Bruce was himself the third largest investor. (The other spreadsheet from 5/13/17 in **Exhibit A**, sent by Galbraith of Middlebury College, also shows this and will be explained later.) & also, Larry gave us the 20% number when he first called and told us that he'd lost everyones money (as he said our investment was 20% of the total pool.) He mentioned nothing then about anyone taking a cut, only that a brother in law was owed a million dollars. It was only a few days later that he called back and said the brother in law was willing to let go of some of it and take a cut on what he was owed, (and this reduction in Larry's debt burden was a mutual relief, although we had no idea what his brother in law's original invested principle had

been.) On the phone the reason given re the payment drop, which was given to Sallie Mack as well, was that "the family wants to be paid back first." There have been many discrepancies and unclear, shifting stories with Larry.

(14) It was after this (February-April 2017) Sallie and then later Mr. Bassett informed us that one of the investors, whom they identified by her first name as Dona, (later as Berney when Larry finally gave us the spreadsheets and talked to us again on the phone re her, so we knew she was Dona Berney) was putting much pressure on Larry to pay her back all of her principle, (which was not large compared to the overall amount they were saying they owed everyone) and he said (as Sallie had also) that she needed a car and asked if we could take a further cut in what we would receive from the house (meaning, for everyone to so we could collectively have the money for her.) We had heard some of her situation from Sallie and felt bad for her and it was clearly the right thing both for her and the entire situation, so we said yes. The odd thing is that Larry never actually gave us a quoted further percentage drop verbally or in writing, and when we put the leins on their house and said we had to finally see the spreadsheets, (which had long been promised) the percentage he had set for us remained at the 13% he had dropped it to (without asking us that time) before Dona ever put pressure on him, which again makes us wonder at the arbitrariness and inconsistency of things with Larry, which often felt and seems to us as just made up to fit what he wanted at the time. We know that it if he did really lose all the money that these are not easy decisions to make, with numerous upset people, yet the shifting and illogical explanations, the unreliability of his word, has been very distressing.

(15) Please note that we said "if he really did lose all the money" as we really have no idea what really happened. It's possible he never traded at all, or that he traded well and never "lost" any of it

in trading but simply stole it all in a much different way than he has said, in terms of outright transferring it somewhere else. (Larry has never been willing to show us his trading records etc, despite many requests.)

(16) On April 5, 2017 Larry wrote me about what was happening with Dona Berney threatening legal action against him, although he did not mention her name in the letter. He wrote "Thank you, again, for allowing me to work on paying you back the debt I owe you." and then later "From what they have said to me, this would probably tie up the sale of our home, which could eventually cause us to lose our home, and could have further consequences which could prevent me from paying everyone back, either temporarily or permanently. They have reduced the amount of payment by about 40%." By permanently Larry was meaning jail, as if one is in jail long enough they cannot work for anyone's repayment. Which is why he also said "Thank you...for allowing me to work on paying you back"...instead of our reporting him to authorities who could bring incarceration. Then he wrote "Again, I ask you to please forgive me for this whole situation. But, I am totally committed to paying you back the debt I owe you, if I am allowed." Meaning if he could be kept out of jail to do the work of paying us back. He asked me to forgive him as he knew he did wrong in a very serious and criminal way. {See **Exhibit C** (7) 4/5/17 emails.}This is a court of civil law, and we are only pointing out the seriousness of Larry's actions.

(17) So we had found out that Larry and Karen's house had sold, and then been told by Larry that the house closing would be in mid May. Then in May realizing we had not received word from Larry about the date it would be, we looked it up online, called someone and thus found out the day

the house closing would be about a week before it happened, as Larry had not informed us, which alarmed us. When we called Sallie after we found out, she also had not known the date the house closing was.

(18) Then in a phone conversation we were told by Larry that he in fact had paid off far less on the house than he'd previously told us; it was now suddenly $130,000, which he now claimed he'd always told us, though he had not. We'd previously and from the start been told $330,000 by both Larry and Sallie. (This is the amount Sallie was also told by Larry.) & so we'd be getting far less than he'd ever said. This was deeply upsetting to us. We had talked to Larry a number of times about this, (and to Sallie a number of times about this), in which the equity amount in their house was brought up. Suddenly it was different. **The overall pattern has been that Larry (and Karen) said things to appease us, which in time were seen to be not so, or it was seen that they chose to not take things they committed to seriously.**

(19) In fact when I, Jeanine, had talked to Larry on the phone after the percentage we were getting on the house sale proceeds was dropped to 13% and Larry had told Bruce and Sallie that it was as the family investors wanted to be paid off first, I had told Larry that I was upset that he'd chosen to do this and drop the percentage promised us, especially as, with the amount of equity they had in their house he could have mostly paid off the Vermont investors with its sale-- if the Vermonters were to be paid off first {– which for a short time before this Larry had said he was going to do in response to our being so uncomfortable that of the Vermonters only Sallie had known him long term, and he was going far away from us to Texas with family, who had known him long term and could more easily keep tabs on the situation. We had suggested that due to this, that the Vermonters

be paid off or mostly paid off from the house sale, and were **never** told there was far too little equity for this anyway.} In response to my saying this Larry said nothing and did **not** say,"No, Jeanine, even if the Vermont investors got all the proceeds from the house it still would be way too little to get close to paying them off." & Larry also did not say this to me, Bruce, when Jeanine handed the phone back to me. & please note that when he first talked to us about selling the house he said all investors would receive the proceeds and we ourselves would get 20%, as we had invested 20% of the total investment pool. No explanation as to why the family should be paid back first was given, just that it's what they wanted. Larry gave different numbers at different times for what the Vermont (non-family) investors were owed in total, but it never exceeded $500,000. The low was $380,000, which was the more cited and original number given. (This may be due to the difference between people's princ., le and interest earnings.) On 5/12/17 I wrote to Larry "…plus you told Jeanine and I that the amount of money owed to those in Vermont was 380. Jeanine wrote down what you had said…The issue is this: I Do Not Know the investment history of anyone that you have listed. You may have been cooking bogus interest reports for years and not just in 2016. Some people might have been amassing a small fortune on your day trading wizardry off of a little bit of capital, which then serves them, to eat into my requested return of capital rate that you have quoted to me. That is one of a number of reasons why I do not have trust in your accounting parameters, skills and sense of fairness." {See **Exhibit C** (8), Re:Options, 5/12/17} & again, we know these were not easy decisions to make, it can be very hard to decide what are right or just percentages to pay people back, but it was the lack of consistency, the dishonesty of shifting numbers and shifting stories, and the lack of disclosure to provide a real view of the situation, that has above all else been hard.

(20)  & it was hard seeing the family repayment prioritized, without further explanation, when they would not even communicate with us in the smallest, most anonymous way to express concern for our mutual difficulty, despite what was communicated from us through Larry and Sallie. (& this had us further question if there was mutual difficulty or if it was all on our side.)

(21) & we also found out at the same time (about a week before the closing) that Larry had not set up any type of escrow for oversight re the disbursement of divided funds amongst the investors, which we'd talked to him about in previous months, and he had understood the need for it (for the house sale and generally.) Larry now told us that he could not afford the escrow, that in fact he could not afford a lawyer for the house sale. (Yet once we put liens on their house and said we had to see the closing statement, **we saw that they did have a real estate lawyer for the sale**.) Again the general pattern is that Larry and Karen said many things to appease us, including in giving apologies with promises at hand, that they did not intend to follow through on or give real thought and effort to. Much can be inferred from their actions and lack thereof.

(22) & in talking to Larry about all this a week before the closing (particularly the house equity number drop) I asked him, "When did you know it was crashing, with your trading?" & he admitted that he had already lost all the money before my Sept 6, 2016 check of $27,000 was given him. Thus he lied and deceived me, in an even more serious way than we'd previously known, in having used the earning reports as a ruse, prior to and after the fact of having lost everything, and consciously taking $27,000 on false pretenses, knowing it was theft. Larry used phony accounting practice and direct lying in order to steal. Further, he admitted thus that he lost everything before Sept. 2016, yet he still on paper has reported earnings up to Nov. 2016. The magnitude of Larry's

deception has not fully been determined, particularly because Mr. Bassett has still not provided Trading Records per his agreement found in our contract of May 15, 2017 for full financial disclosure, nor provided full financial disclosure in general. From what Larry said it was well over **5 months** past the time he had lost everyone's money, before he told us that he had.

(23) On May 11, 2017 I received an e-mail from Larry stating that we could meet them at the parking lot of Aubochon Hardware store on Rt 7 in Middlebury, across from the mortgage company after the house closing, to give us a check from their packed van right before they drove off to Texas.{See **Exhibit D**,(1)} After he had lied about the state of finances, had deliberately taken my $27,000, and everything else involved, it did not instill confidence that such a transaction would take place, especially in a parking lot with them ready to leave for Texas.

(24) & so then we were **very** concerned that they may never give us a check from the house sale and may go to Texas and we'd never hear from them again. Plus the fact that Larry and Sallie both had told us that no investors wanted to talk to us, and that the family investors did not want to was made particularly clear, which made us feel more vulnerable with Larry going far away to Texas with people who wouldn't communicate with us at all, of whom we really had no clue if they really were investors or really had lost their money as we had, all had me realize we needed to do a lein, and Jeanine fully agreed.

(25) On May 9 I had written to lawyer Toni Deslaurier "Here is a promissory from Larry Bassett… Also in his note to me he said he said he will 'disburse my earnings' at the end of April from work that he has done…well I asked him about that today and he said it would take time to get established…This is another reason I have lost trust." {See **Exhibit D**,(2)}

(26) In May 2017 liens consisting of those contracts with Larry (which outlined money given him), for the principle of $197,000, were placed on the Bassett's house through the Town Clerk's Office, Cornwall, Vermont, as a means of ensuring that we would be treated as fairly as possible (considering the overall situation and what we were aware of at the time) and would receive proceeds from the house, other than the shifting sands of Bassett's ever changing story which he counterbalanced by his confession that he was sorry and intended to pay us back. {See again **Exhibit A** (1), contracts became Cornwall liens on Bassett.}

(27) Larry and Karen (and Sallie) were quite upset to learn about the leins. There was much freaking out that we were jeopardizing everything. After talking to Larry for awhile, however, Larry himself said he did understand why we had done it, that it was the right thing to do, particularly due to the fact that he had admitted to taking the last $27,000 check from us knowing he'd already lost everyone's money (which had been on 9/6/16.) On 5/12/17 I wrote to Larry "My lein represents hard cash principle of what I have contributed, I did not include what I should well get for 2015 interest which I have reported to the IRS, and should be part of the expanded full claim, nor that of 2016 interest (for) which I have not gotten a 1099." {**Exhibit D** (3) Re:Options, 5/12/17}

(28) The liens were not legally contested as Larry and Karen knew well the reality of what we were owed.

(29) In talking and negotiating with Larry at one point at this time, Larry told me, as I wrote to our lawyer Toni Deslaurier, "One interesting twist is that he is now saying that the money for 2016 is

not being reported as there were not interest earnings, and he said that he is 'giving me' this money. So since he says he is giving me this money, then give it to me, and then he can pay a gift tax." As ridiculous and evasive as that was, this is an example of the differing stories that came from Larry. If there were in fact no earnings f. r 2016, then the fraud reaches farther back and it is very serious that he took even longer than he originally said, to tell us the truth. To Larry I wrote "Also Larry if you have the power to give people money, as you are saying with the amount above principle, who is going to pay the gift tax? So how are you going to give money you do not have? For if you had the money then you could give money, but you are not a bank to create money at your whim…or was that the delusion all along…Also nice to see the realtor making out here, how nice, while her fee is about the amount that you took from me even when you knew you were out of money. Sothebey's go figure probably the most expensive." {See **Exhibit D** (4) To Toni **and**  (5), 5/12/17, letter to Larry}

(30) In another email to Larry at this time period I wrote "…Such assurance speaks to the veracity of your said commitment to pay off those with whom you owe money. All of which speak to and necessitate mechanisms of oversight and accurate accounting, which have not come to pass as promised…I have provided option. to go forward, of fair play, as escrow is, by exercising my right in the situation of what reflects is your admitted lying, to which I honor your coming forth with a measure of honesty, but can not abide when my trust has been further, repeatedly challenged." {See **Exhibit D** (6), Fwd:Options, 5/12/17}

(31) On May 13 I wrote to Larry "And what number was your account, or am I supposed to believe that the person doing the trades had no interest in this whole thing, other than other people's capital?" (See **Exhibit D** (7), 5/13/17)

(32) We agreed to release the liens we'd registered on their Cornwall house (registered a few days before the house closing) in exchange for their signing a contract (composed by Bruce Marshall and Jeanine Weir, with our lawyer's approval) agreeing to give us full financial disclosure (of both Larry and Karen, of all assets and income etc), that all investors would be paid by an escrow for all future payments to investors (for transparency and oversight of the situation) and that we would be paid the balance of what we were owed and a percentage of all future income, etc. Both Larry and Karen signed this at the title company the day of the house closing, and it was notarized then and there by an officer of the mortgage company. {See **Exhibit E** (1)} May 15, 2017 was the closing date on Larry & Karen Bassett's home 4534 Rt. 30 Cornwall Vermont 05753, which sold for $440,000 with $133,256.53 Larry and Karen Bassett's equity on the house after other expenses were deducted. Check was received for $27,000 from Larry and Karen through the Mortgage company to myself (Bruce Marshall.) {$ 27,000 was asked for all the already stated reasons and that I didn't want to be paid less than the Sothbeys RE agent, and $27,000 was the amount Larry admitted he had taken from me, knowing all the money was gone.} [See **Exhibit E** (2), for closing statement, which we told Larry we had to see after we put the leins on his house, and record of check received on 5/15/17 from the house sale, (3).]

(33) After Larry informed us that he'd lost everyones money and that they were going to sell their house in Vermont and move back to Texas, with family (since they said they could no longer afford to live there but family were willing to take them in) and that the proceeds from the house would be split among the investors, he said he would send us a spread sheet of what all the investors were owed and what everyone would be paid at the sale of their house, without names. We know it took

him awhile to decide how to divide the profits, are sure that may have been hard, yet despite many promises we only got the spread sheet once we put the leins on the house and said we had to see it before the house sale. {See **Exhibit D** (1) May 12, 2017.}

(34) After we put the leins on Larry and Karens house we were contacted by the Vermont Securities Division, Department of Financial Regulations, as they had received word of the leins. We did not file a complaint with them until ea.ty May of 2018.

(35) We did feel bad for Larry and Karen (as well as everyone involved) and have tried to give them time to get on their feet, tried to give them the benefit of the doubt, to be patient, to give Larry support that he can begin anew and clear things up, that (in getting honest) things can work out over time, and we still do want to support Larry in going in a better direction. Yet due to the continuing dishonesty and untrustworthyness displayed we do question whether they care at all if investors are paid back, (particularly those outside the family) as from what we have observed in general and how they've treated us, it seems they do not care if we are ever paid the balance of what we're owed. It has seemed to be a game of appeasement and empty promises to string us along and give as little as possible until the clock runs out.

(36) After Larry told us he'd "lost" everyone's money and they were selling their house (to pay everyone back and as they could no longer afford it) I (Bruce) had told Larry that we needed to have a lawyer serve as escrow to oversee the proper dispersement of funds among the investors, and Larry had agreed with this but then a week before the house sale he said they could not afford it, and then further stated that they could not afford a lawyer for the house closing. However, once we put the liens on their house and Larry called us about this, in negotiating we told him we had to

see the house closing statement, which he emailed us that day and we saw on the statement that they had indeed retained a lawyer for the house sale.

(37) Part of what we wanted from the leins was for a lawyer to be an escrow to issue checks from the house sale to be sure we and all investors were paid and to have oversight for the situation (since we weren't sure if all the investors would actually be paid otherwise, thought they may lie and run off, and we knew that at least some of the investors in Vermont we were aware of were real and owed money.) After we put the liens on his house Larry agreed to an escrow and then said his real estate lawyer Fred Peet had agreed to do it {See **Exhibit F** (1),5/13/17} and when we called Peet to check re this (after the house sale), he first required Larry's permission to talk to us about it. We thus got Larry's permission and were told by Peet's office that "All 13 of the investors were paid." (Whatever that means as we still don't know who all these people are.){See **Exhibit F**, (2),1/19/18 and (3),1/30/18.} Was the best we could do to try to help yet wish we had realized certain things sooner.

(38) At first we felt some reassurance from what we heard from Fred Peet's office, but then we realized that in fact on the spreadsheet's from Larry 15 (fifteen) investor's were listed, with ourselves and Dona included. There are so many discrepancies with Larry. Our lawyer sent a letter asking Peet to send a copy of the escrow records to her (and she included a copy of the notarized document Larry and Karen both signed) requesting more info so we could complete the due diligence promised for the situation, and was refused by Peet; Peet said he was sending the letter on to Larry to request his permission to release the records. To date there has been no affirmative response from Larry. {See **Exhibit F**, (4) and (5)} Seeing the escrow records from Fred Peet is a part of full financial disclosure, which Larry and Karen agreed to in signing our document at the

house closing. There is the need to compare the escrow records to the spreadsheets given to us by Larry before the house sale, which Peet has no knowledge of, etc, for true oversight and understanding of the situation. There is the need to compare all of this to the trading records as well (and to bank records, which contain numerous large wire transfers, etc.) We have also asked Larry directly numerous times, to see the escrow records, to no avail.

(39) In June 2017 we received a Priority Mail package from Larry (sent 6/20) containing partial financial records of Larry and Karen Bassett. (See **Exhibit G**.) We very much regret that due to being seriously ill, being overwhelmed by the situation with Larry and having to deal with other very pressing matters in our community (and our lives in general), we did not go through those records immediately and thoroughly upon first receipt, as they are quite revealing and to us, quite a shock.

(40) {As already stated, in March 2017 Larry had said he would pay out earnings from his tax work at the end of April, which never happened.} Then on Sept 7, 2017 Larry said he was still sending out job applications and was doing businesses and he would start sending everyone quarterly checks from his earnings via escrow, in October, which never happened. (Via escrow as the document they signed at the house closing also said Larry would pay all investors from his earnings through an escrow, for the sake of oversight.) {See **Exhibit H** (1)}

(41) On January 30, 2018 Larry said he would be mailing us "the projections we have for the businesses this week." This did not happen. {See again **Exhibit F** (3)}

(42) He repeatedly said that business plans were coming soon, yet it has all been a continual postponement with reasons/excuse given, no escrow was set up, and he has not been in touch with us for quite awhile, since March 2018 (despite our phone calls etc, asking for his trading records, his promised business plans, etc) and we have not been paid a penny since the house sale. (See emails with promises, last one March 1, 2018 in which a packet of business plans were promised. Karens father did die when Larry said he did, found obit, see all in **Exhibit I**. Anything that may have been inherited/transferred to Karen at this point we were not informed of. There is no will.)

(43) & also note: In our last phone call in March he said he would be in touch with me monthly, which has not happened, has not been in touch at all.

(44) So Larry and Karen told us they were destitute and had to sell their house and go to Texas to live with family and look for work there, would start businesses to pay everyone back. Then once in Texas he told us he could not find a CPA position there (despite many job applications) and they had been struggling with places to live, trying to find somewhere they felt ok and finally did. He said they were doing what jobs they could to scrape together money to start a business or more than one (dog breeding, which they said they'd done in the past, was a main focus but also mentioned maybe starting a hand cream or dog food business with his daughter) from which they could pay people back. Larry kept saying they had to find a dog to breed and "We can't find a dog, we can't find a dog." Again, we knew there was much we didn't know but the story seemed plausible (at the time) and we felt bad for their struggles, even if they brought much on themselves, and were trying to give him time and a chance to get on his feet and act on his words of remorse and desire to live a more honest life. From what he described it sounded like he became like a gambling addict with

trading (without informing anyone of anything.) We didn't know **how** fraudulent (to what degree) what he did was and still don't, as we don't know all the facts and are missing information. The most terrible part is that he did not tell people he'd started to lose so they could choose to opt out, that he'd started to lie and abandon the conservative, careful approach we had invested in. Who knows how long things were sour before he admitted things, may have started quite awhile back. Again we don't even know if the money was "lost" in trading & Larry has been unwilling to release his trading records to us, even after the document they signed at the house closing. We have just wanted Larry to get and stay honest, learn from the whole thing and do what he can to pay us all back. If we are not paid for years or ever, this is going to be very destructive for us, especially as Jeanine has been seriously ill and we really need the money. We have wanted Larry to have the chance to turn himself around in the realm of the world and find deeper quality of life, and to be able to actually work to pay the investors back if they really do not have enough assets to pay off everyone right away (although we have found out that were not left poor and have located some assets, and we do think they are hiding much.) We also don't want to be abused, or for him to abuse and prey on others, as has already happened.

(45) One of the times we talked to Karen on the phone after Larry told us he'd lost everything, I, Jeanine told her that the amount of our money Larry had lost was for us a huge amount (that we could not afford to lose) and she said in a distressed voice "Ten dollars is a lot of money to us" and "We never spent any money on ourselves, it all went into Larry's business." So she was in essence saying that even before this tragedy they lived super frugally with great sacrifice. Yet besides the obvious expenditure on the house they'd been living in (which was not inexpensive), after Larry and Karen signed the document agreeing to full financial disclosure, in June 2017, as mentioned, Larry did send us a package of documents (**Exhibit G**, put in hyperlink) which was far from full

financial disclosure but it's explained a lot, and they very clearly did spend much on themselves personally, including during and after the time they were telling us they were destitute and in great debt with no other income or resources but small social security checks. They were spending quite a bit of money and had quite a bit of income much of the time. For example, in Larry and Karen's January 17, 2017 National Bank of Middlebury statement, it lists credits over $75,000 and debits over $80,000 (with a balance on 1/17/17 of $4,000+), and on their February 2017 statement it lists credits of over $77,000 and debits over $80,000 (with a balance on 2/21/17 of $824.00 ) with many personal expenditures. These are not bank statements of "destitute" people with no income but small social security checks, who had long been living super modestly andsimply to the point of great self denial, as Karen had expressed. Larry and/or Karen were regularly and often flying around the country to various places, spending on lodging and much else. (We do not know what they were doing—could be vacations, travel to areas they have real estate or due to involvement in religious group/s we have found out they've been involved in, etc. Larry's father was dying in 2016, and we heard Karen had an ill sister she visited, yet that does not explain it all.) There are numerous expenditures on products sold through network marketing, and people told us Larry was selling water filters in Vermont, yet we've never received anything from such earnings, (if there were any.) If it was mostly personal expenditure, it is a lot to be spending particularly when you are in debt to people you've disenfr nchised. (We have wondered if they were involved in money laundering.) We were told by old friends and neighbor's of Larry and Karen's of their buying a $25,000 chair. The bank statements reflect an exorbitant lifestyle at our expense.

(46) We later found information online that they had been breeding puppies and selling them with their son in Vermont, during the same time period that they were telling us that they were not able to find a dog, were destitute and had no or very little income but their social security checks.

(Autumn 2016-May 2017.) The puppy selling they were doing with their son under the business name "Ebenezer's Goldens" has continued in Texas, there are listings under their son's name with this same business name and their joint address (as they have been living with their son in Pittsburg, TX), which in our mind most likely involves Larry and Karen, though on the public QT. (Larry and Karen have offered puppies for sale on their Facebook page as well.) In the one tax return from 2015 that Larry gave us (if it's real; it looks like it was not filed, as is writ on top of it, **Exhibit G** ) they said they made $100,000 breeding golden retriever puppies and persian kittens and "creams" on their farm, that year. This is a lot of money in what may have involved much cash. (There is also info online from Larry's daughter in law Charity selling kittens and puppies in Como,TX, saying that they are a large family doing this. Larry was living in Como with family before he went to live in Pittsburg with his son, and of course we could be wrong that they were involved, helping with this and paid when they were there but of course it is possible. See **Exhibit J**.)

(47) Further, the fact that Larry and Karen made $100,000 in 2015 solely from breeding animals and selling said "creams" on their farm, calls into further question why they needed to sell their house and leave for Texas, and shows further that they were lying in saying they had no or very little other income but their small social security checks (and we've so far seen no evidence of their destitute impoverishment and resourcelessness in Vermont or Texas) and Larry's long time gripes about "we haven't been able to find a dog" seems to us like a feigned helplessness.

(48) The Vermont Secretary of State's Office of Professional Regulation has Larry listed as having renewed his CPA license on March 14, 2018 (see **Exhibit K**), so we have guessed that he is still doing tax work for people here in √T, yet we have received nothing. Further, an old friend of Larry and Karen's has informed us that Larry had an ad/promotion on their Facebook page offering

tax/accounting services for people in Vermont and Texas (which we had surmised via his recently renewed Vermont CPA license.) & again this further calls into question why they had to sell their house and move to Texas, since it seems he's still had clients here, is still making money doing accounting work for Vermonters. Larry numerous times told us he had tax/accounting work coming up that we would be paid from, yet we have never been paid anything.

(49) Larry's father died in December 2016 and Larry was co-executer and co-heir with his brother Randy, as stated on the will (in the event of their mother preceding him in death, which she did.) In the "Order admitting will to probate and granting letters Testamentary" on 1/17/2017 it says that Larry executed a waiver of right to serve as joint independent executor in favor of his brother., and perhaps this was in part as his brother lives in the same town his father did and it was easiest for him solely to deal with it, **yet technically they both were co-executers, from the moment his father died on December 20**, and it seems to us that Larry did this to be less responsible for the non-disclosure of received assets from his father, to his creditors. His father's house in Texas was sold very close to the time Larry's Vermont house was sold (in May), yet he never told us this or that he'd inherited anything nor that his fathers estate was going into probate. (Which it did from 12/29/2017– 1/30/2017.) & thus they were lying that they had no other assets when Larry had co-inherited this house, etc. (See will and related documents, **Exhibit L.**) Under the conditions of probate the executers have a fiduciary duty to notify creditors of an inheritance going into probate. Larry did not do this (and either did not inform his brother, his brother did not ask or his brother chose to participate in Larry's dishonesty) and Larry was thus engaged in hiding assets from creditors in a fraudulent and unlawful manner. We do wonder if Larry waited to tell us that all was lost until he was technically no longer co-executer, yet since according to Larry all was lost well

before December 2016, we were owed money and creditors well before Larry's father died, and he was hiding this and assets received from his father. (**& if Larry did not in fact "lose" the money in trading but simply took it in a very different way, the pre-meditated concealment of assets is fraudulent.**) We found a property owned by Larry's son Mark and daughter in law, in Como, Texas, which seems to be a property listed on Larry's fathers will, in which Larry's father was holding the title- the property was subject to contract deed from Larry's father to Mark and Charity dated Feb 5, 2016. Considering that in that amount of time they would not have paid a lot off to the grandfather, this strikes us as possibly a fraudulent conveyance, considering that Larry was in debt and that property should not have been given to them. If it was not given to them and Larry now holds the title, (his son Larry Mark and daughter in law Charity are listed on the Hopkins county tax office website)—at the very least, a portion of the proceeds in their paying off the property, should have been going to investors, as Larry inherited half of the entire estate. {See **Exhibit L**, (5)}

(50) Further, when we first met with Larry at the Middlebury co-op to give him the first check we ever did, (which ironically started off with Bruce making a lighthearted joke about "Is this a Texas holdup?") in the course of conversation he told us that his father in Texas was "living on only a $300 per month social security check" and "is fine with that" and "wouldn't the world be a better place if more people could be happy living like that." So after we finally got a hold of Larry's dad's obituaries, they were not obits of a poor man. He was an investment broker and developer, had owned a cattle ranch and a Ford dealership, was a pilot who owned a small plane and had been vice-president of the U.S. Pilots Association, and was a principle in an Architecture and Engineering firm. The will did not present the amount of money the obituaries pointed to, though it also was not that of a poor man, and we have heard from old friends and neighbors of Larry and

Karen's that his father was indeed wealthy.  So it has seemed to us that what Larry said to us at the co-op that day may possibly have been as he was even then intending to rip us off and wanted to throw us off the scent of his fathers money when his dad did pass, as he was getting up in years at that point. (His story about his dad fits in a little too much with Larry and Karens claim to be destitute and frugal, while their bank records showed a lavish lifestyle.) This may or may not have been pre-meditated but we have questioned where Larry's dad's money went, and if there was any direct correlation between Larry's investing   "collapsing" at the same time that his father was nearing death and dying. (We have wondered if he was using his father's trading account amongst other questions.) {See **Appendix L** (6) Obituaries}(Furthermore, since long before February 2017 Bruce did tell Larry that I was seriously ill and he was caring for me, we have wondered if our vulnerability was a factor in his choice to do what he did to us.)


(51) On Larry and Karen's tax records that they sent to us they reported income coming from Lee county, Texas, and we found that Karen is receiving income from some type of mineral rights in Lee county, Texas, which may or may not be what is referred to in the tax return. Karen's father did die, {see obit in Exhibit M (2)}Her mother is still alive but were told by friends that Karen did get something from him and it may be this or is at least part of what she received. So again, this contradicts their story of having no other income or assets besides small social security checks, and they never gave us a penny on the percentage of their earnings on any of this (nor liquidated it to pay us back) despite their verbal and written agreements to do so with all accrued funds.


(52) The fact that they told us they had nothing and were going to work so hard to pay the investors back, and then we found out they had chosen Sotheby's to sell their house, was to us incongruous. They may have wanted someone who could push hard to sell a pricey home (which we understand)

yet to us was a questionable decision with motive and implications that left us to wonder, considering the cut they knew the RE agent would be given when there are other real estate agents who can be found who charge less and are very competent, successful home sellers, if one cares to make the extra effort to really look for them, to conserve funds for obviously pained investors when one is **actually** destitute and without current further means to pay people back. (This is to not even mention the fisbo option, but perhaps that seemed unfeasible to them.) In addition, when Bruce called Fred Peet's office for confirmation about the investors being paid at the house closing, he talked to Sherry Barton who said that Larry and Karen had to bring money to the house closing. The week before the house sale Larry told us he only had $130,000 equity in the house, a number he'd never said to us before. Yet where had the money come from that they'd brought to the house closing?

(53) Further, we just recently found public record info on trulia.com and zillow.com that they first put their house on the market for sale on 10/10/16 for $524,000 (see **Exhibit N**.) It was then taken off the market on 1/09/17. So they had put it on the market long before we were told Larry had lost all the money, and question if they were going to sell it and leave Vermont without telling us, inform us later. The house could have been sold before any of us were informed of anything. The fact that their asking price dropped to $450,000 when they put it back on the market on 2/27/17, and that it ended up selling for $84,000 less than their original asking price, has us think that perhaps they were not interested in getting the maximum amount to pay off investors, but were mostly interested in getting out of Vermont asap, to make it harder for any Vermont investors to file a complaint against them, collect on a "judgement" or to track them in general. All things considered it does not seem that they sold the house for us, to pay off the investors, and because

they could no longer afford it. Ins' ?ad it seems they wanted to flee and perhaps pay us off a cursory amount to throw some bone to the dog.

(54) When I, Bruce, would talk to Larry about what he was doing business-wise or what he planned to do, he would not talk to me in-depth about this, he was generally evasive, which did not breed trust.

(55) I, Jeanine, sent Larry an email on May 12, 2018, (see very end of **Exhibit P**) trying to reach Larry, to help him come to a sense of conscience in the situation as a whole and also hoping to evoke a response. We have received no overt response from Larry. This letter is personal; we did have a personal connection to Larry (and Karen) after he told us that he'd lost all the money. We both talked to him quite a bit and prayed with him on the phone, and I told him at one point that he could call us at anytime for praye: support, if he wanted to pray together on the phone. The letter I wrote comes from this personal connection with Larry, as we have felt potential in him and have tried to support evoking that of his better inclinations. He was not obligated to respond yet we're saddened he did not.

(56) We have no idea if all that Larry says is owed family investors in TX, is really owed or if some or a significant amount of this was perhaps made up (while money is handed over to family or their religious group/s or etc.) Sallie Mack, after Larry came out with his news, told us that a bunch of investors did not have contracts with Larry. This we have found out included Dona, who was a real investor. Yes, some others may have been trusting Larry in this way as he was family or other

reasons and people can be very naive about various things, as we ourselves were naive to whatever degree with Larry. Just am noting this. Yet there needs to be real, full investigation into all of this with Larry and Karen, and especially into determining if the Texas/family investors were truly investors and if they actually lost money or were involved in fraud—email records, bank records, records of receipt of original principle investment etc all needs to be looked at to determine who were real investors and what, if anything, people are still owed. We have said this repeatedly to those at the Vermont Securities Division, that many records need to be subpeonaed. If any have been, we have not been told, as we are given practically no information. That said, we do **very much appreciate** their work, which did, it seems, push Larry to communicate with us again, and their reaching out to us after we put the leins on Karen and Larry's house. We're now seeking to have things subpoenaed to find out some basic things ourselves, info that will go to us and the Securities Division, but not solely to them.

(57) The document Larry and Karen signed at the title company the day of the house closing, we had written up for Larry to pay us 13% of all income, etc, due to compassion for the other investors owed money (although we had no idea who all these people were, if owed all claimed) and the fact that Larry told us that he and Karen were now destitute, in great debt with no other income besides a small Social Security amount, no assets besides their Cornwall house (but that they both would work to pay everyone back.) We took the 13% number that Larry himself had decided to give us, which he had written up in a Promissory Note on March 25, 2017 (See **Exhibit C**) after I said we had to finally have the promised promissory document. Considering that we have found out that they were not "destitute" when they told us this, had not been and were not living the super frugal life Karen had claimed, had gone through so much money and did have other income/assets besides their social security checks, have not followed through with many times promised business plans, at

various times said he had secured work and money would be coming, which never did, and have not given us the full cooperation and full financial disclosure promised in that notarized document (which includes to release to us his trading records, and of course includes records of all bank accounts, assets, income, tax records, investments, real estate, inheritances, trusts etc, and info from the escrow records for true oversight), have not been in touch with us for quite a stretch of time, have not returned our phone calls etc, since March, and have not paid us anything at all outside of or since the sale of their Cornwall house, we no longer consider or accept ourselves bound by the 13% put in that document, as Larry and Karen have not kept their side of the contract, or in general their many promises, and things were fraudulently presented to us as facts that were not so, which had us agree to the 13%, not realizing the scope of the situation, and thus we are pursuing this action. (In hindsight we wish we had not released the liens until we had full financial disclosure in hand, which would have helped all the true investors much more than the route we have taken.)


(58) Very soon after Larry told us he'd lost all the money I (Jeanine) started telling Larry (and Karen) that even if they made 150k/yr, it would take them many years to pay us all back (to which they at times said no, it will not take us years) and that some of us cannot afford to wait years for our money to be returned and that they need to find some type of super rich angel loaner (or donor) who is into taking risks and wants to help out some people who've been hurt by this, so they can consolidate their debts instead of dealing with numerous upset people. This is what is referred to in the contract they signed on the house closing day {re an angel loaner, in **Exhibit A,** (8), 5/15/17.} We have never received word from them that they made true efforts in this regard. We do not know to what extent Larry is an actor and what may actually be real, but we are just praying for grace on the whole situation and believing there can be healing in the overall schematic of what's occurred, for all concerned, including Larry.

(59) Further, we have found out that fellow investor Dona Berney did not have a contract with Larry, due to her trust in Sallie Mack, a close long time friend of 30 years, and all she was told about Larry's low risk approach. She does have long time emails with Larry, etc, yet the fact that Larry as a CPA did not furnish her with a formal contract, shows a professional disregard and disenfranchisement. Many of us have been naive to whatever degree regarding investments and the reality of Larry's character, yet Larry as a CPA well knew better. It was due to the legal pressure put on Larry via a lawyer retained by Dona, and the strong pressure and negotiation both she and her boyfriend David put forth with Larry, **that was the reason she was given all of her principle back at the house sale.** (This is not only secondhand or surmised information; we had heard through Larry and especially Sallie the amount of pressure Dona was putting on Larry; Dona and David much later explained to us what happened, and Davids negotiation with Larry, and Dona has given us a copy of the legal papers her lawyer sent to Larry and a letter given by Dona in response to the inquiries of the Vermont Securities Division.) We are only including this to help clarify the overall situation with Larry, that he was not just being considerate in agreeing to pay her principle back in full (not her reported investment earnings.)

(60) Recently we talked to two lawyers with good federal court experience in VT (although both said they were too busy to take another case they both did talk to us at length) and one felt we may be able to receive payment through CPA malpractice insurance, if he has it, but we need to find out if he has it as he has not been willing to communicate with us in quite awhile. The other lawyer felt we would not be able to get payment from CPA insurance as once the insurance company heard our story they would say it was fraud and so refuse to pay, that we would never get paid that way. The

first lawyer thought CPA malpractice insurance would possibly pay for fraud, that it's possible, but again we'd need to know if he has it.

(61) On 6/18/18, we received an email from the Vermont Securities Division, Department of Financial Regulations, informing us that Larry had responded to our complaint, which we sent in early May. (Larry was asked to send a copy of his response to us as well, which he didn't do. It took awhile to get to him in the mail, he said, as the complaint was sent to his previous Como, Texas address and had to be forwarded. He had told us he was moving to Pittsburg, Texas but never gave us an address, despite his agreement to keep us thus informed, thus we did not have a current address. Then he gave some other reasons why he hadn't done it yet, to the Securities Division, but now it's here.) They sent us a copy of what Larry sent that pertained to us, {see **Exhibit O** (1), for Larry's response to our complaint} which to us is confounding and sad, as it is only a partial story/disclosure. To begin with, this spreadsheet brings to mind a spreadsheet he gave us days before the house closing {see **Exhibit O** (6)} due to my (post- leins) request of Larry on May 12, 2017, to see a spreadsheet with all the investors (what owed) with distribution calculations (for the house sale proceeds and in general what he intended to pay people, **as he'd long been promising**) and in addition another spreadsheet was requested: "Also one done on earnings at the end of 2015, to exclude 2016's 'said' earnings", due to the fact that Larry was not willing to provide a 2016 1099 and we did not know what had happened, or when things had collapsed, and I wanted another view of this. On 5/13/2017 I'd **also** requested a report of everyone's original cash principle, as we had no idea of that. {See **Ex O**, (2) and (3)} The spreadsheet sent on May 12, 2017 (that had been long promised, the general breakdown of what people would be paid from the house and generally), was fine. The spreadsheet sent May 13, 2017 (see attachment via Monica Galbraith) from a Middlebury college employees email (as he was having email trouble, we were told) was very strange to us. On

the left side at the top of that page it says "Principle"—these are calculations of people's original principle, on the left side column. On the right side column is what people's balance was on Dec 31, 2015. On the top left side he listed my principle (besides BM) as 193,800. I emailed him and said "193,800?" {See **Exhibit O,** (7)} and he wrote back and said "197,000 minus 4 $800 payments." You see, I had arranged with him to start taking a draw on my reported earnings— those reported by Larry. Yet he was now subtracting my interest earnings from my actual principle. It was not an accurate record of complete, original cash given by myself to Larry. I called him upset and he said he had only written up what I had requested of him, yet the reality is, a report of original principle is just that and no less, and if it is to exclude 2016 earnings, that does not mean you subtract reported earnings from ones original principle, and leave unaccounted for the reported income that taxes were paid on to the IRS, leave unaccounted for that people were not just giving him money to hold for awhile for no reason, that if they knew nothing was being made they would choose to go elsewhere to bring in earnings that they need, that deception has effects. On 5/13/2017 I wrote to Larry "So basically by this calculation you are further admitting that you lied to me. For to take funds out of an account that has supposedly been earning interest, documented by a 1099, one is not reducing the principle until one takes money out that is in excess of money accrued, which had not happened by my understanding. Thus the fraud is now further exposed by your calculations here...You see these spreadsheet figures are all sort of mist to me. So now I have some better idea of principle, but not what people might have taken out, and I do not know who people are, I do not know if this is all made up, that some of these supposed people are dummies, family members perhaps that are part of or not part of what is criminal activities of stealing money. You stole money from me and I do not know how far back that started...Thus I write a note relevant to my registered demand of the Return of all of my Principle. Now!" The email also goes into the fact that Larry admitted to both of us that he had taken $27,000 from us after he knew he'd already

gambled everyone's money away; thus the further irony of subtracting those payments from our principle. **Larry never responded to this email; the third page of Exhibit (8) shows what he wrote after he'd received this from us, in Larry's typical non-response, avoid and change the subject pattern.** There are many questions Larry has never responded to, many times we have tried to reason with, engage and confront him, and he just avoids it all.{See **Exhibit O** (8)}

**The spreadsheet sent by Larry to the Vermont Securities Division**, outlines money I gave Larry, which he calls "additions", (in which he acknowledges the original principal I gave him of $197,000) and then he calls "subtractions" payments he gave me when I was taking a draw on reported earnings, the last four months until he informed me that all the money was lost. There is no reporting here of all the interest he said I'd earned, which he'd sent me written reports of and verbal confirmation as well, along with 1099's. (There is certainly no reporting of the $27,000 he admitted taking from me after he already knew everyone's money was gone.) That Larry would turn interest payments that had been a draw off of my earnings that he was reporting to me, into a deduction off of my Principle original cash given him, is very outrageous and upsetting to us. Yet he already gave us the Promissory Note on March 25, 2017 for $238,198 (see again **Exhibit C**), and the May 12 , 2017 spreadsheet/graph breakdown of what he owed all the investors and what he planned to pay them at the house closing (Dona's being based on the settlement they had agreed on, though it excluded her earned interest.) In that breakdown he was showing he owed me $238,198. (It would have been $241,398 if I had not had the 4 $800 payments.) Of course since receiving $27,000 from the house sale, it is now down to $211,198. This is the reality since we were not giving Larry money out of the blue for no reason, it was for investment earnings that he provided us 1099's for

37

and we reported it to the IRS two years in a row. As previously stated, he was not willing to give us a 1099 for 2016, despite all the earning reports received.

There is also another spreadsheet from Larry {**Exhibit O** (9), 2016} with the column "Principle" which does not differentiate original cash principle from earnings, and the column "(Disbursed) Additions" in which he is once again subtracting the $800.00 payments on earnings he was reporting, from the last $27,000 cash principle invested with him. Obviously this was given to us sometime after he broke the news to us of having lost everyones money.

(62) When we received the packet of financial info from Larry after he signed the document at the house closing for release of the leins, in June '17, he sent us a signed document saying I would be receiving 13.22%  of their three life insurance policies, if he were to die. {See **Exhibit P**, (1) and (2)} Larry had originally promised l would be a beneficiary on his policies after he had informed us he had lost everyone's money but both he and Karen were going to work hard to pay all the investors back. I had then said, "What happens if you die, Larry? If you die we are totally screwed. Do you have any life insurance policies?" & he had promised to leave all the insurance proceeds from his policies to the investors owed money. He had said they would cover the debt. So this was in keeping with this promise, and we were thankful he had finally followed up on this. However, when we finally called the insurance companies about the policies listed, two of them informed me that my name was not listed as a beneficiary on these policies. They said my name would have been registered if I were a beneficiary. I was informed by an employee at one of these insurance companies that this happens too often in fraud, that a signed note is given that you are a beneficiary to a policy but you are not actually put on the policy as such. The third insurance company would not talk to me at all on the phone and I was told to contact the policy owner, told they could only

talk to the policy owner. In trying to get things in writing from the other two insurance companies, likewise they wrote back that they could only give information to the policy owner and to contact them directly. Banner Life did contact Larry about the matter in July but we have received no response from Larry about this or the other two policies, despite asking him about it. So it appears that I am not on the policies at all. & Larry's and Karen's lack of response to this shows us once again how little they truly care to follow through on their commitment to us. {One of the policies is Karen's; see communications with life insurance companies and emailed PDF to Larry and Karen re this, **Exhibit P**, (3), (4) and (5)}

(63) On July 1, 2018, Larry sent us an email in which he said "I'll try to get you some projections this coming week for the rest of this year and next year." We wrote him back and communications followed, in which our requests for trading records, full financial disclosure (bank records, earning records, etc) were, once again, patently ignored. As a Certified Public Accountant presently registered in Vermont and having been comptroller for Middlebury college, Larry is fully aware of what constitutes "full financial disclosure". This has only been partially provided, a fragment of what has been requested and committed to contractually. We tried to communicate our hurt and frustration with their behavior and direct them again towards paying us, yet the only communication returned has been a pattern repeat of what we've heard before, which is empty maneuvering. Perhaps they are buying dogs, but we still have not received any payment since their Vermont house sold. **On September 4 we sent them a critical letter via PDF** about the life insurance policies and everything else and on September 13 Larry responded to this letter with: "Just to let you know I received your email and will respond to it soon, thank you". Yet as of today,

November 15, we still have not heard back from Larry. This is typical of Larry's pattern of avoidant, non responsive behavior and empty promises. {See **Exhibit P**, (4), (5) and (6)}

(64) In fact, Larry and Karen's lack of real response to our September 4 emailed PDF, which he informed us he did receive, itself constitutes an admission.

(65) We would never have invested with Larry if we had known that there was not going to be an honest keeping to the low risk procedures/policy promised, that Larry was not an honest person. We trusted him particularly due to his having been a CPA/comptroller for Middlebury College, and were relying on his professional acumen and standards to give reasonable care to our situation and funds. If we had known the reality of who Larry is, we would have invested our money elsewhere.

(66) On August 6, 2015 we further invested $40,000 with Larry, and in looking at their National Bank of Middlebury records, we do see that deposit into their account, and the next day $37,000 was wire transferred out of the account. Larry may have wired our money to his trading account, yet why if so was not the full $40,000 wired, what happened to the other $3,000? & why wasn't it deposited directly into his trading account? We are only trying to figure out what happened. We first invested with Larry on October 22, 2014, yet the bank records he mailed us in 6/2017, only start at 6/16/2015, and go to 5/2017 (with a few things blocked out), with nothing given since then. On 10/28/ 2015 Larry deposited the $20,000 check I gave him, (pg 1 of 11/17/15 bank statement) and on 10/29 there is an outgoing wire transfer of $15,000, similarly. (See bank records, **Exhibit G .**)

(67) On Nov. 8, in talking to a long time friend of Larry and Karen, someone who was midwife for numerous babies in their family (not Sallie), we found out that Larry had been let go from Middlebury College, that he had lost his job **quickly**, no notice was given, seemingly overnight out of the blue one day he was put out, that Larry had said he'd had no warning or notice prior to this day. This was at a period of strong financial prosperity for the College and this occurred just a few years before his expected retirement. Prior to investing we had been told by Sallie and then Larry that he was retired from Middlebury College, not that he had lost his position. Larry's seeming good standing with the College, with his continued use of their email and free meals at their school cafeteria, was part of why we had trust in him. We would like to find out the story of why he was let go.

(68) On May 13 before the house closing I wrote Larry "I have also done a service here, for now there will be oversight, and the escrow is part of the first step. There are a number of things that we have asked for, and that will be formally brought forward for closing, or by Civil Suit if not addressed properly. I certainly have the right and prerogative to institute in motion the type of consequences that I have heard are part of what Dona has promised should things not go through." So Larry and Karen were forewarned and were given a year and a half since the house closing alone (and a year and 9 months since Larry informed us of his news) to come through on their stated commitments, which hasn't happened, and thus we are filing this federal complaint. {See again **Exhibit O**, (9)}

(69) Larry is not incompetent, he is clearly competent in many ways, being a CPA who worked for Middlebury College, and as we saw in the Cornwall town records he has paid off a number of mortgages including home refinancing. He has bought, sold, restored and greatly improved homes,

profited from various business ventures (some farming, etc) and in his bank records that we've so far seen, he many months was both bringing in and spending quite a lot, yet generally managed to spend just under what he brought in, regardless of the amount, which shows a level of control despite what to us are very large monthly expenditures, many times. Larry clearly has some level of serious "dysfunction" in having lost ethical grounding and direction, yet he knows he did wrong and can comprehend appropriate action and what would be ethical steps in the general sense, yet has chosen not to do what would be in alignment with this. He has chosen to disregard us. He is not 5 years old and is responsible for what he's done. Ditto re Karen. They were very much a solid team, a united front that showered us with apologies and expressions of sorrow for our mutual loss, (with Larry's containing clearly stated awareness of his wrongdoing) and with a presented united commitment to everyone's repayment, yet little has come of it, they have treated us with an underhanded brutal disregard.

(70) Although our case does not solely rest on interpretation of contracts, still our contracts are important and thus we cite that "If a court properly determines that that the contract is unambiguous on the dispositive issue, it may then properly interpret the contract as a matter of law and grant summary judgement because no interpretive facts are in genuine issue." And even though our contracts are clear and obvious and uncontested, we add: "Even where a court, however, determines as a matter of law that the contract is ambiguous, it may yet examine evidence extrinsic to the contract that is included in the summary judgement materials, and if the evidence is, as a matter of law, dispositive of the interpretive issue, grant summary judgement on that basis." Goodman vs Resolution Trust Corp., 7 F.3d 1123, 1126 (4th Cir. 1993). So herein we are pointing out the direction we deduce things should go with all the material facts, our contracts and all other evidence presented.

(71) In terms of the contracts, it must be noted what was not in the contracts: there was no clause or disclaimer about risk or waiving Larry from liability. This was sold to us as low risk, very conservative investing; we were told that Larry had stop orders and would not expose himself bellow a certain level, and that he dipped in and out of the market for short periods, and that altogether his technique had a long track record of safety and good returns. & this fits in with WHY Larry promised us repayment—because he knew what he'd done was wrong, knew he'd lied to us and stolen from us and promised "low risk". It was not just innocuous and unforeseeable mistakes out of his control. (& it is one thing to choose to gamble with ones own money, and quite another what happened here.)

(72) Larry violated our original contract, risking money in a way that was a clear violation of the careful, low risk, conservative approach we were offered and invested in, and lying to us about what was going on ("things are going well" etc), continuing to report earnings and then taking (at least) the last $27,000 we gave hi. ι knowing all the investment money was gone. (If he indeed did lose the money, as we ultimately don't know. It is possible he simply took everyone's money in a very different way, transferred it elsewhere.)

(73) Larry, (as already stated) also did not return our principle or earnings to us within 10 days of request, in violation of our contract and mutually understood agreement.

(74) Both Larry and Karen have violated the contract they both signed on the house closing day at the title company, in not providing full financial disclosure, in not providing full cooperation towards the resolution of this debt, and in not paying us anything since the house closing.

(75) The signed document Larry sent us in June 2017 giving us 13.22% of their life insurance policies, (as he had promised my being a beneficiary on their policies both verbally, in email communication and in the contract they signed on May 15) it turns out was not backed up in reality in registering me as a beneficiary on any of these policies. Nor have Larry and Karen responded to our emailed questions regarding their policies (and re Banner Life's communication to them in July as a result of our enquiries to their company.)

(76) Larry has seemed to us to have an affability that he has unfortunately exploited (if the affability itself is genuine), yet he also has a real ability in the art of acting, and we were to varying degrees (even when much more subtly so) duped for too long; yet we also were trying to give them a chance to hark to certain realities and come through with repaying us. Being fully relieved of all resultant credulousness, we have written our own pro se complaint for an order of discovery and restitution.

**The situation as a whole is fraud, consumer fraud, accounting fraud, breach of fiduciary duty, malpractice, Professional negligence, breach of contract, fraudulent deception, fraudulent concealment, fraudulent conveyance, fraudulent misrepresentation; both negligent and intentional misrepresentation with deceit (but primarily intentional misrepresentation),**

**breach of covenant of good faith, unjust enrichment, and Promissory Estoppel. Above all it is
fraud, of more than one type.**

Larry (and Karen) have deceived us, given false promises, lied and omitted many facts about their
overall situation and had, received, and spent much money before and during the time they told us
they were destitute and without assets except for their Cornwall, Vermont home. Inheritance from
his father, some of which went into probate, was never disclosed. They know they owe us this
money and have generally and over-all shown through their actions that they are not actually
interested in paying us back. Much is obvious and much deceitful intent can be inferred from
extrinsic facts and circumstances. Larry did make it clear to us from the time he first called to
inform of us of the loss of our funds, that he knew he had done wrong, and now it is clear that he
has chosen to disregard us further versus what would be a serious attempt to mend fences and
change his ways. It now seems to us that they have been playing us along deceitfully, avoiding their
responsibility to us, in an attempt to run out the clock and get past the statue of limitations, and in
general to avoid payment. Larry has engaged in misleading, unfair and deceptive business practice
and Karen has as well, she has involved and committed herself as well, both verbally and
contractually. Karen's role in this is a part of why we did not file suit much sooner.

### FIRST CAUSES OF ACTION

### FRAUD, CONSUMER FRAUD, ACCOUNTING FRAUD,
### FRAUDULENT CONCEALMENT, FRAUDULENT DECEPTION, FRAUDULENT
### MISREPRESENTATION

"Fraud: An intentional perversion of truth for the purpose of inducing another in reliance upon it to part with some valuable thing belonging to him or to surrender a legal right; a false representation of a matter of fact, whether by words or by conduct, by false or misleading allegations, or by concealment of that which should have been disclosed, which deceives and is intended to deceive another so that he shall act upon it to his legal injury." (Blacks Law dictionary) Brainerd Dispatch Newspaper Co. v. Crow Wing County, 196 Minn. 194, 264 N.W. 779,780

" 'Bad faith' and 'fraud' are synonymous, and also synonyms of dishonesty, perfidy, unfairness, etc." (Blacks Law Dictionary) Joiner v. Joiner, Tex.Civ.App., 87 S.W. 2d 903, 914, 915

"It consists of some deceitful practice or willful device, resorted to with intent to deprive another of his right, or in some manner to do him an injury. As distinguished from negligence, it is always 'positive', intentional." (Blacks Law Dictionary) Maher v. Hibernia Ins. Co., 67 N.Y. 292

"Fraud, in the sense of a court of equity, properly includes all acts, omissions and concealments which involve a breach of legal or equitable duty, trust or confidence justly reposed, and are injurious to another, or by which an undue and unconscientious advantage is taken of another." (Blacks Law Dictionary) 1 Story, Eq.Jur. 187 ; Howard v. West Jersey & S.S.R. Co., 102 N.J. Eq. 597,141 A. 775,757

D.Vt. 1999. "Under the circumstances of a particular case, there may be a duty to disclose information, based on a relationship of confidence or trust between the parties, or based on one parties superior knowledge or means of knowledge, for purposes of claim for intentional misrepresentation under Vermont law; where such duty is present, the failure to disclose material facts coupled with an intent to mislead or defraud constitutes a material misrepresentation." Morton v. Allstate Ins. Co., 58  F.Supp.2d 325

Vt. 1980. Time of conveyance is relevant for determining if transferor debtor has made fraudulent conveyance. 9 V.S.A. 2281. Becker v. Becker, 416 A.2d 156, 138 Vt. 372

Vt. 1980. To establish fraudulent conveyance, plaintiff must establish that there existed right, debt or duty owed to her by defendant, that defendant conveyed property which was subject to execution in satisfaction of defendants debt, that conveyance was without adequate consideration, that defendant acted fraudulently to the hindrance of plaintiff's rights against him. 9 V.S.A. 2281, Becker v. Becker, 416 A.2d 156,138 Vt. 372

VT 1925 "Concealment of a material fact like a misrepresentation as to such fact, amounts to 'fraud'." Moncion v. Bertrand, 127 A. 37,98 Vt 332

VT 1866 "Misrepresentation may consist as well in the concealment of what is true as in the assertion of what is false." Graham v. Stiles, 38 Vt 578

D.VT 1987. "Fraud must consist of some affirmative act, or of concealment of facts by one with knowledge and duty to disclose." Sutfin v. Southworth, 539 A. 2d 986, 149 Vt. 67

Vt. 1980 "Action for fraud and deceit will lie for false promises if these promises can be shown to be essential to a scheme to defraud." Union Bank vs. Jones, 411 A.2d 1338,138 Vt. 115

Vt.1976 "Key element of claim sounding in fraud is that the representations were relied upon to the claimants damage." Fay v. Van Ells, 367 A.2d 167


Larry only described his trading to us as low risk, due to his special technique of dipping in and out of the market for a short time with stop loss orders. Meaning he would stop trading if he lost too much. We would never have invested without hearing this, and of his long track record of safety. Larry and Karen concealed many facts from us, gave false reports of earnings by Larry's own account, did not inform us of any downward turn in his trading so we could honestly assess the situation, admitted to outright deliberate theft of $27,000, promised us both verbally and in writing

in emails and contractually both in our original contracts to return all funds (within 10 days upon request), and in the May 15 document, to return/repay our money and to give us full financial disclosure, which only a fraction of what was agreed to has actually been given (and not a cent paid since the house sale.) Larry and Karen both lied about being destitute with no other assets besides their house in Cornwall. On January 25, 2017 Bruce requested that Larry send him $5,000 of his money and Larry did not respond until or soon after February 7, when he informed Bruce and I that all the investors money was lost, with no means to pay anyone back. Yet Larry had in December co-inherited his fathers estate, and on February 9 he turned over a house he had inherited to his son and daughter in law, ignoring Bruce's request for funds and his overall responsibility to us and all the investors who depended on his care and professional skill in the situation, whom he was contractually responsible to. Larry lied to us about this, saying he had nothing to pay us back anything, but he was so sorry he had been dishonest and lied and wanted to change and get right with God and do all he could to repay us. He talked as if he understood when we said we could not afford to lose this money and the gravity of my illness, as if he had real remorse. (Much like he wrote Bruce on April 5: "Again, I ask you to please forgive me for this whole situation. But, I am totally committed to paying you back the debt I owe you, if I am allowed.") & then he gave this house to his children, in an action that shows to us now that he did not actually care if we had our money returned, that he was still willing to outright steal from us (which this act was) that his words to us had been nothing but an act and pretense to fleece us of our funds. Perhaps on some level Larry did feel bad about what he was doing, but he was certainly still willing to defraud us. Giving this house to his son was a fraudulent conveyance. Then in May, days away from the closing on their Cornwall house, Larry's fathers house sold, and being co-heir he surely received half the proceeds, and about this we also were not informed and given nothing, lied to that they had nothing else. We have also found out Karen has some mineral holdings.

When after the May contract was signed, in June we received bank records of Larry and Karen's joint account at the National Bank of Middlebury, which show they were going through very large sums of money most months, including during the time they were saying they were destitute and without anything to pay us back. Numerous months they were bringing in and spending very much per month, living an extravagant lifestyle at our expense. (Such as going through $187,000 in the month of July-August 2016. The next two months they went through $45,000 and $60,000 respectively.) Larry many times promised us business plans and payment from work he said he had coming or was currently in the middle of, yet nothing has ever come through, which has been a deliberate malicious disregard and disinfranchisement. Larry has never responded to our requests for trading records, proof of what happened to our funds, true full financial disclosure, information on whether they had actually really tried to obtain an "angel" loan to pay us back (as they had contractually committed to on May 15.) Nor have they responded to our enquiries re Bruce not actually being put as beneficiary on their life insurance policies, as was promised verbally numerous times, in email, in the May 15 contract they signed, and in the life insurance promissory note given Bruce in June 2017. All of this was intentional deception, dishonesty, false representation and design to defraud us of our funds with deceitful, noxious disregard. If we had known what they were to do and what we now know, in February 2017, we would have filed a court complaint immediately, and if we had known they were going to for the most part not follow through on our May 15 contract, we would never have released the leins on their house, we would have at the minimum required ha ing full financial disclosure *in hand*, before they were released. This would have been far more helpful to all true investors, than what did occur. We were trying to be compassionate to the other investors but it actually would have been more helpful the other way. We have tried to give the Bassetts a chance to change and shift to a better, freer life that does not

involve ill intent toward others, but despite our attempts to redirect them and stoke their consciences this has not happened and thus we are submitting this legal petition to the justice.

It is very clear to us now that Larry and Karen were playing us along deceitfully from the beginning of this, hoping to manipulate things long enough that we pass the statue of limitations.

Larry and Karen have not been just struggling and inept or incompetent but well meaning. Larry chose to not respond to numerous inquiries, statements and calls of distress and concern for our future, chose to lie about their financial situation, lifestyle and assets, to deny us payment and ignore his duty and contractual, professional responsibility to us, consciously chose to deceive and cause us harm with the malevolent purpose of separating us from our funds.

## SECOND CAUSES OF ACTION

## BREACH OF CONTRACT AND BREACH OF COVENANT OF GOOD FAITH

"There is an implied covenant of good faith and fair dealing in every contract that neither party will do anything which will injure the right of the other to receive the benefits of the agreement." *Comunale v. Traders & General Ins. Co.* (1958) 50 Cal.2d 654, 658 [328 P.2d 198]

"Breach of Contract. Failure, without legal excuse, to perform any promise which forms the whole or part of a contract." Blacks Law Dictionary, Friedman v. Katzner, 139 Md. 195,114 A. 884,886.

In *Carmichael v. Adirondack Bottled Gas*, 161 Vt. 200 (1993), the Vermont Supreme Court described the implied covenant as follows: "An underlying principle implied in every contract is that each party promises not to do anything to undermine or destroy the other's rights to receive the

benefits of the agreement." Shaw v. E.I. DuPont De Nemours & Co., 126 Vt. 206,209,226 A.2d 903 (1966). The implied covenant of good faith and fair dealing exists to ensure that parties to a contract act with 'faithfulness to an agreed common purpose and consistency with the justified expectations of the other party.' " RESTATEMENT (SECOND) OF CONTRACTS § 205 comment a (1981).

" 'Every contract imposes upon each party a duty of good faith and fair dealing in its performance and its enforcement.' The covenant of good faith finds particular application in situations where one party is invested with a discretionary power affecting the rights of another. Such power must be exercised in good faith." Carma D· velopers (Cal.), Inc. v. Marathon *Development California, Inc.* (1992) 2 Cal.4th 342, 371–372 [6 Cal.Rptr.2d 467, 826 P.2d 710

Larry broke our original contracts in not keeping to the low risk, conservative investment approach promised, in giving false verbal and written reports of gains when he was in fact losing (at least according to the story he gave us), in stealing directly and outright the last $27,000 Bruce gave him, knowing he had already lost everyone's investment money (by Larry's own admission), in not returning the $5,000 Bruce requested on January 25, 2017 within the 10 days stipulated in the contract, and in not returning the whole amount within 10 days after Larry informed Bruce he had lost everyone's investment money and Bruce told him he had to have our funds back (and it again was not returned within 10 days.) Larry and Karen broke our May 15, 2017 contract (signed for the release of liens we put on their house in Cornwall) in giving us only a fraction of the full financial disclosure promised, which includes not giving trading records and other proof that our funds were actually lost, all bank and financia' records, all employment and earning records, etc, and in not paying us anything at all since the house sale, and in giving a fake fraudulent promissory note that

Bruce was beneficiary on their life insurance policies, when by what we have heard he in fact is not. Larry and Karen's lack of giving us any response at all about the insurance policies speaks to the severity of their disregard for our contracts and their contractual, legal and ethical commitment to us.

If Larry and Karen didn't want to sign our contract on May 15 to release the leins on their house, they didn't have to, and then we would have submitted a petition to the justice in May 2017 and resolved things then.

Larry and Karen have not honored or dealt with our contracts honestly, fairly or in good faith, have acted as if they are discardable and of minor consequence, and more so (and more obviously so) as time has passed.

## THIRD CAUSES OF ACTION

### BREACH OF FIDUCIARY DUTY, PROFESSIONAL NEGLIGENCE, MALPRACTICE,  UNJUST ENRICHMENT and PROMISSORY ESTOPPEL

"Malpractice: Any professional misconduct, unreasonable lack of skill or fidelity in professional or fiduciary duties, evil practice, or illegal or immoral conduct." (Black's Law Dictionary) Gregory v, McInnes, 140 S.C. 52,132 S.E. 527, 529

"Unjust Enrichment, Doctrine of: Doctrine that a person shall not be allowed to profit or enrich himself inequitably at another's expense." (Black's Law Dictionary) American University v. Forbes, 88 N.H. 17, 183 A. 860, 862 " 'Unjust enrichment' of a person occurs when he has or retains money or benefits which in justice or equity belong to another." (Black's Law Dictionary) Hummel v. Hummel, 133 Ohio St. 520, 14 N. E. 2d, 923,927

52

"Doctrine is not contractual but equitable in nature." (Black's Law Dictionary) State v. Martin, 59 Ariz. 438, 130 P .2d, 48, 52

"Promissory Estoppel: That which arises when there is a promise which promisor should reasonably expect to induce action or forbearance of a definite and substantial character on the part of the promisee, and which does induce such action or forbearance, and such promise is binding if injustice can be avoided only by enforcement of promise." (Black's Law Dictionary) New Eureka Amusement Co. v. Rosinsky, 126 Pa.Super. 444, 191 A.412,415.

*Woolaver v. State*, 175 Vt. 397, 833 A.2d 849 (2003)("To enforce a claim for promissory estoppel, plaintiff must show '[a] promise which the promisor should reasonably expect to induce action or forbearance on the part of the promisee or a third person and which does induce such action or forbearance' and that 'injustice can be avoided only by enforcement of the promise.' "), quoting *Foote v. Simmonds Precision Prods. Co.*, 158 Vt. 566, 573, 613 A.2d 1277, 1281 (1992) (quoting RESTATEMENT (SECOND) OF CONTRACTS § 90(1) (1981)).

A fiduciary is someone who owes the duty to treat a principal "with the utmost candor, rectitude, care, loyalty, and good faith- in fact to treat the principal as well as the agent would treat himself....the client, is in no position to supervise or control the actions of his principle on his behalf; he must take those actions on trust; the fiduciary principle is designed to prevent that trust from being misplaced." Burnett v. Miller, 957 F. 2d 1375, 11381 (7th Cir. 1992)

53

Larry was named co-heir and co-executor of his fathers estate, and thus was co-executor according to his fathers will from December 20, 2016 until January 17, when he executed a waiver of right to serve as such in favor of his brother Randy. As we said before this may in part have been as Randy lives in the same town his father did, so was easier for him, yet it is clear to us that Larry also did this to be less accountable for the non disclosure of the receipt of assets from his father, to the investors, his creditors. This non disclosure (as beneficiary and as co-executer) is breach of fiduciary duty (in his capacity with the estate and in his contractual capacity with us) and unjust enrichment (as well as other things including fraud of course.) Larry has had a professional responsibility to us to use reasonable care and skillful honesty in the stewardship of our funds. We had trusted him in part due to his being a CPA who had been Comptroller for Middlebury College (and he has still used a Middlebury College email.) We were counting on his professional acumen and skill sets to act competently and fairly in the situation. Bruce worked hard from the time we first invested with Larry, to keep in frequent contact with him and make sure all was well. The amount we invested was quite a lot for us, and if we had known earnings were going down we would have pulled our funds out and put them elsewhere. (Yes, if Larry really was investing and really did "lose" the money as he said, this is obviously what he wanted to prevent, people from pulling out of the pool, yet at least that way people would have pulled out and investors would still have had their funds; the "pool" was lost anyway, better for it to have been with everyone's principle intact.) & as already stated, had we known the larger truth about the situation that we know now: Larry and Karen's undisclosed assets, the amount of money they were often bringing in and spending many months, that they were not "destitute" or frugal as claimed, the flurry of lies that would follow, and that they did not have serious consideration and intent to pay us back and honor their commitment to us and would be and remain unconscionably unresponsive to our requests, we would have filed a legal petition to the justice back in February 2017.

Larry has been severely professionally negligent in breach of the "duty of care" that he has naturally owed us, and we have suffered both economic loss, loss of an unbelievable amount of our time in dealing with this, in having to put in solid and all too often exhausting work to grapple with the situation the past 20 months (albeit with illness to boot) and it has also been a significant traumatic stress.

Larry and Karen gave us both very significant verbal and contractual promises for our repayment and for full financial disclosure, which we relied on to our detriment.

Numerous elements and factors and the overall situation involves breach of fiduciary duty, professional negligence, malpractice and unjust enrichment.

## FOURTH CAUSES OF ACTION

## AIDING AND ABETTING FRAUD, ACCOMPLICE TO FRAUD, AIDING AND ABETTING BREACH OF FIDUCIARY DUTY, JOINT AND SEVERAL LIABILITY FOR FRAUD AND GENERAL TORTIOUS ACTIVITY

"Aiding and Abetting in Violation of 18 U.S.C. Section 2

Title 18, United States Code, Section 2

Anyone charged with providing assistance to another person (called a "principal") in their commission of an illegal act is considered to be an 'accomplice.'

18 U.S.C. 2. Principals

(a)      Whoever commits an offense against the United States or aids, abets, counsels, commands, induces or procure. 'ts commission, is punishable as a principal."

"Civil liability for aiding and abetting provides a cause of action that has been asserted with increasing frequency in cases of commercial fraud, state securities actions, hostile takeovers, and, most recently, in cases of businesses alleged to be supportive of terrorist activities…the doctrine since has flourished in suits arising from prominent commercial fraud cases, such as those concerning Enron Corporation and Parmalat, and even in federal securities cases some courts continue to impose relatively broad liability upon secondary actors." americanbar.org, Jan. 9, 2017, *Richard C. Mason,* 61(3):1135—1182 (May 2006)

"COMPLAINT FOR: 1. AIDING AND ABETTING BREACH OF FIDUCIARY DUTY   2. SECONDARY LIABILITY FOR SECURITIES FRAUD 3. FRAUD BY MISREPRESENTATION 4. FRAUD BY SUPPRESSION AND CONCEALMENT OF FACT     5. NEGLIGENT REPRESENTATION" Theodore 'l.D. Jones, Jeanie Kayser-Jones, and Robert Frost v. Armanino LLP, Civil court case in Alameda county, CA, filed June 18, 2013

"By definition an accomplice must be a person who acts with the purpose of promoting or facilitating the commission of the substantive offense for which he is charged as an accomplice." State v. White, N.J. 1984, 484 A.2d 691

Vt. 1976 "If promise is shown by evidence to be a part of a general scheme or plan to defraud, the promise can be the basis of an action for fraud." Conniver v. Baker, 365 A.2d 264,134 Vt. 466

**Karen has direct and co-responsibility in this (and with all charges, including Promissory Estoppel, – except Professional negligence and malpractice, regardless of what she knew or did not before the investors were informed) and she also has had culpability for aiding and abetting Larry.** Karen involved herself in this, committing to work with Larry for our (and all the investors) repayment and claiming they were destitute and lived an overall extremely frugal lifestyle with nothing spent on themselves, which have been seen to be very false and deceitful statements, intending to give a wrong impression to manipulate our compliance. She acted so grieved at our loss and so willing to do all she and they together could to pay us back, yet neither of them have kept their word. Karen gave both her verbal commitment to work to repay us (and everyone) back, and she signed our May 15 contract in which she agreed to everything along with Larry, she took co-responsibility. Karen is a principle in what occurred, having worked hand in hand with Larry to present a strong case of sorrow over our collective loss and a strong front of commitment for her and Larry to work and repay us (all.) Karen lied and deceived us, offering a pretense of care and commitment that was deliberately put forth to appease and mislead us until we gave up and/or in time lost our chance at legal recourse. Karen is both directly responsible for her own significant part in this, and she also has liability for aiding and abetting Larry, for going right along with the deliberate deceit. They were not "destitute", were bringing in and spending quite a bit, and did have other assets and they chose not to return our money, not a cent since or before the house sold. Since February 2017 we have only been paid back what we received at the house sale. This is theft.

## PLEAS FOR RELIEF

Wherefore, we are asking for a summary judgement especially and above all for fraud. We have no idea if Larry might try to discharge his debt to us (or to the other Vermont investors who are real, whoever actually are real investors) through bankruptcy, but we want this avoided. We are seeking summary judgement *without trial* as we do not want additional legal fees and the further trauma of having to go to court over this (although we will if we must.) Our case is somewhat detailed but not very complex, is very straightforward and solid, very tight, a case where the law is well established and the factual record is clear. It is in essence simple.

This has been a huge waste of our time, has involved a massive amount of exhausting work and been a major emotional stress and trauma since February 2017, in having to continually deal with this and try to keep tabs on so many things that Larry and Karen would let go to nothing if we did not keep on top of things or attempt to, such as their insurance policies, asking the National Bank of Middlebury for information on wire transfers etc (which was not given despite our 5/2017 contract), doing research and proverbial digging to look for undisclosed assets and clues to what happened, etc etc. Our shared (by both Jeanine and Bruce) long term affliction with Lyme disease, Jeanine's very serious, has made the loss of these funds that are so important for our future, all the more of a trial, and has made our grappling with this situation as it unfolded all the harder, amidst dealing with her illness. Due to the immense amount of time, energy, work and emotional stress this has been for us since Larry informed us he'd lost everyone's money, the toll it has had on many levels, we are asking for treble damages. The basic payment we are owed is $211,198 (again see contracts, IRS statements, etc, in **Exhibit A**, Promissory notes dated 3/25/17 for $238,198. in **Exhibit C**, and the spreadsheets sent by Larry before the house closing in **Exhibit A and Exhibit O** *which explains them*, in which he put myself, BM for Bruce Marshall, at the top of the graph.)

So in subtracting $27,000 from $238,198, we get $211,198, the amount Larry still currently owes us.

**Before summary judgment is given we do want discovery to be able to subpoena much information about the situation.**

For us to complete the due diligence promised by Larry (and for full financial disclosure they agreed to in general) we need to know that promised payment from their Cornwall house sale proceeds did go to all true investors, and thus the escrow records held by Fred Peet need to be released to us. **Patricia Seitz, a Miami, Florida lawyer, in ABA Journal had a compilation of information that interrogatories can collect, which included: "a. The identity of all lay witnesses who have knowledge of the facts of the case" (which would include the investor names on Fred Peets escrow records) and "C. More details about claims or defenses." and "l. The "existence, description, custody, condition, and location of documents and tangible things relating to the subject matter" {Seitz, "Get more information and less indigestion out of your interrogatories" 71 ABA Journal 74 (March 1985) }** We also need to see his trading records, and much else, to see what really happened and where our money went; there is much info that it is likely would hold many answers.

As we've said to the Vermont Securities Division, much info is needed to thoroughly investigate what happened and if the family and those in Texas are real investors who also lost money and if so what they are actually, currently owed, and for this email records would be invaluable and critical. Possibly overnight created contracts are not enough. Again, Larry and Karen agreed to and gave us

legally full financial disclosure (and repayment) in exchange for release of our liens, and that includes all the information previously named in this document.

We are seeking investigation into all of this and especially into determining **who else may have been involved in the fraud**—email records, bank records, records of receipt of original principle investment etc all needs to be looked at to determine who were real investors and what, if anything, people are still owed.

We would like help to get into my (Bruce's) yahoo email, which a few years ago I became unable to get into (some type of password glitch) and it has past email records between Larry and I.

We do want Larry and Karen to pay all of our legal fees.`

We are asking for a percentage of pre-judgement interest be paid by the Bassetts, as well as post judgement interest per annum be paid on what's owed us, if the debt cannot be paid off immediately. Post judgement interest is asked for to help motivate the Bassetts to pay us, as otherwise we are concerned they may throw up as many roadblocks as possible to try to delay and block our payment, post-judgement, from being received.

We have just heard this morning (11/14/18) from an old friend of Larry and Karen's that Karen's mother just died. We are asking that a hold be put on probate and all transactions from Karen's parents estate, any and all trusts. TOD and POD accounts, investments, life insurance payments etc, until things are sorted out about who was involved in this fraud and who is currently still owed money.

We also ask for such other and further relief to which plaintiffs are entitled at law and this court may deem just and proper.

Bruce R. Marshall & Jeanine Weir

(Pro Se)

P.O. Box 45

Rochester, Vermont 05767